1  Laura Saitta
2  3525 Del Mar Heights Road #1834
   San Diego, CA 92130
3  Telephone (703) 677-2174
   Email SVGK2025@gmail.com

4  Plaintiff in Pro Per

5

6

7

8                 **UNITED STATES DISTRICT COURT**
9              **SOUTHERN DISTRICT OF CALIFORNIA**

10  LAURA SAITTA, an individual;              ) **Case No. 25-cv-1135-DMS-AHG**
                                              )
11                 Plaintiff,                 ) **Second Amended Complaint**
                                              )
12         vs.                                )  1. **Violation of Federal Housing Act,**
13                                            )     **42 U.S.C. § 3601 *et sea.***
                                              )     **(Discrimination Based on Sex)**
14  Greystar Real Estate Partners, LLC, d/b/a )  2. **Violation of Federal Conspiracy to**
    "Greystar," a limited liability company;  )     **Interfere with Civil Rights, 42**
15                                            )     **U.S.C    § 1985**
                                              )  3. **Violation of Unruh Civil Rights**
16  Greystar Management Services, LLC, d/b/a  )     **Act, Cal. Civ. Code § 51**
    "Greystar," a limited liability company;  )     **(Discrimination based on Sex)**
17                                            )  4. **Violation of the Tom Bane Civil**
                                              )     **Rights Act, Cal. Civ. Code § 52.1**
18  Greystar California, Inc., d/b/a "Greystar," )  5. **Breach of Contract, Cal. Civ.**
    a corporation;                            )     **Code    § 1942**
19                                            )  6. **Just Cause Eviction, Cal. Civ.**
                                              )     **Code    § 1946.2 (Wrongful**
20  BOB FAITH, an individual;                 )     **Eviction),**
                                              )  7. **Prohibition of Self-Help Evictions**
21  KILROY REALTY, L.P., a limited            )     **§ 789.3 (Wrongful Eviction)**
22  partnership;                              )  8. **Protection Against Retaliation,**
                                              )     **Cal. Civ. Code § 1942.5 (Wrongful**
23  ANGELA AMAN, an individual;               )     **Eviction)**
                                              )  9. **Breach of Implied Covenant of**
24                                            )     **Quiet Enjoyment, Cal. Civ. Code §**
    JOHN B. KILROY JR., an individual,        )     **1927**
25                                            ) 10. **Breach of Implied Warranty of**
                                              )     **Habitability, Cal. Civ. Code**
26  THERESA BARR, an individual;              )     **§1941.1**
                                              ) 11. **Actual Fraud, Cal. Civ. Code §**
27                                            )     **1572**
    and DOES 1 to 100, inclusive;             ) 12. **Constructive Fraud, Cal. Civ.**
28                                            )     **Code    § 1573**
                                              ) 13. **Conversion of Personal Property,**
                                              )     **Cal. Civ. Code § 3336**
                                              ) 14. **Trepass, Cal. Civ. Code § 3346**

---

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

15. **Nuisance, Cal. Civ. Code § 3479**
16. **Invasion of Privacy, Cal. Civ. Code § 1708.8**
17. **Intentional Infliction of Emotional Distress, CACI No. 1600**
18. **Negligence, Cal. Civ. Code, § 1714**
19. **Negligent Hiring, Supervision or Retention of Employee CACI No. 426**
20. **Negligent Infliction of Emotional Distress, CACI No. 1620**
21. **Burglary Pen. Code § 459**

**DEMAND FOR JURY TRIAL**

Plaintiff Laura Saitta ("Plaintiff") hereby alleges as follows:

The Plaintiff brings this case against Defendants for unconscionable actions against Plaintiff during her apartment residency at One Paseo Village ("One Paseo") from March 26, 2020 to present. This case is about civil rights discrimination of a women living in a penthouse apartment that has been exposed to long term, untenable living condition by Defendants. These actions include, but is not inclusive of, refusing to remove a broken washer/dryer (W/D) unit blocking access to a second bedroom and greatly limiting intended functional use of more than 50% of apartment; breaking Plaintiff's personal replacement W/D; increasing rent 63% through August 1, 2025, when that rent increases again for a total of 74% since initial signing; conspiracy of harassment and retaliation; breach of contract; breach of implied warranty of habitability; breach of quiet enjoyment; fraud; and negligence. A complete list of the claims are included herein.

For these violations, Plaintiff seeks relief including, but not inclusive of, compensatory and punitive damages, as well as injunctive relief as outlined in the second amended complaint.

The Plaintiff hereby demands a jury trial.

## PARTIES, VENUE, & JURISDICTION

1. Plaintiff was at all times relevant herein an individual residing in the judicial district of San Diego County, California, and is a resident at One Paseo Living apartment property where events occurred.

2. Plaintiff is informed and believes and on that basis alleges that Defendant Kilroy Realty, L.P. ("KILROY") is a California company doing business in this judicial district. KILROY is headquarters in Los Angeles County, California and owns the One Paseo Living apartment property in San Diego, California where events occurred.

3. Plaintiff is informed and believes and on that basis alleges that Defendant Angela Aman ("AMAN") is an individual, the CEO at KILROY, and resides in

the Los Angeles County, California area.

4. Plaintiff is informed and believes and on that basis alleges that Defendant John B. Kilroy Jr. ("JOHNJR") is an individual, the former CEO until on or around the end of December 2023 and current Chairman at KILROY, and resides in the Los Angeles County, California area.

5. Plaintiff is informed and believes and on that basis alleges that there are multiple Defendants that conduct business in tangent d/b/a as "Greystar" including Greystar Real Estate Partners, LLC, d/b/a "Greystar," a limited liability company that operates as a multi-family rental property owner, developer, and manager with office across the U.S.;  Greystar Management Services, LLC, d/b/a "Greystar," a limited liability company that is a subsidiary and acts as property management for rental properties with activities including advertising, marketing, promoting, offering, and leasing the rental of residential units to consumers in this District; and Greystar California, Inc., d/b/a "Greystar," a corporation that operates as a Greystar subsidiary to contract directly with property owners to manage rental properties within California.

6. These Defendants will be collectively referred to herein as "GREYSTAR." Defendant GREYSTAR is a company doing business in San Diego County, California with headquarters in Charleston County, South Carolina. GREYSTAR manages the property at the One Paseo Living apartment property where events occurred.

7. Plaintiff is informed and believes and on that basis alleges that Defendant Bob Faith ("BFAITH") is an individual, current CEO and Chairman of GREYSTAR, and resides in Charlston County, Charlston, South Carolina area.

8. Plaintiff is informed and believes and on that basis alleges that Defendant Theresa Barr ("TBARR") is an individual, current General Manager for Greystar at One Paseo apartment complex, and resides in the San Diego County, California area.

9. Plaintiff is without knowledge of the true names and capacities of the defendants sued herein as DOES 1 to 100, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege their true names and capacities when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of these fictitiously-named defendants is responsible in some manner for the occurrence herein alleged and that Plaintiff's damages as herein alleged were proximately caused by such defendants.

10. This Court has original jurisdiction over Plaintiff's claims arising under federal law, specifically Violation of Federal Housing Act 42 U.S.C. § 3601 *et seq*. (Discrimination based on sex), and Violation of Federal Conspiracy to Interfere with Civil Rights 42 U.S.C. § 1985,

11. Plaintiff's state law claims are so related to those under which this Court has original jurisdiction that they form part of the same case and controversy. Supplemental jurisdiction is therefore appropriate over Plaintiff's remaining claims pursuant to 28 U.S.C. § 1367.

12. This court has jurisdiction of Plaintiff's claims for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as Federal Rule of Civil Procedure 65.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events giving rise to the claims made herein occurred in this Judicial District, and Plaintiff resides in this Judicial District.

14. Plaintiff is informed and believes and on that basis alleges that Defendant KILROY and its leadership team are located in Los Angeles, California within the neighboring U.S. District Court for the Central District of California.

15. Plaintiff is informed and believes and on that basis alleges that Defendant GREYSTAR appears to have at or around four hundred (400) properties currently in California with at or around one hundred nine (109) properties in

the San Diego area, and therefore has personal jurisdiction with sufficient minimum contacts to have a connection to San Diego, California for this Court to hear the case.

## INTRODUCTION

16. All allegations of this complaint are made upon information and belief, without prejudice to amendment, supplementation, contradiction, withdrawal, or deletion of any allegations, or Plaintiff's rights to prove the facts at trial after it has been ascertained.

17. Plaintiff avails herself of the doctrine of alternative pleadings and, inasmuch as her investigation is not complete, and discovery and investigation is ongoing, pleads each allegation, cause of action, claim, and remedy in this Complaint without prejudice to any contradictory, current, subsequent or previous allegation, claim or remedy after the true and correct facts have been discovered and pleaded and proven and/or Plaintiff has expressly elected among available alternative remedies. Further, Plaintiff's pleading or omission of any alternative theory, cause of action, or remedy shall not constitute an election of one or more theories, claims, or remedies over, in place of, or to the exclusion of, any other.

18. Plaintiff alleges alternatively that each defendant was the agent, servant, and/or employee of each and every other defendant and in doing the acts herein alleged was acting within the scope and pursuant to such agency and employment at all relevant times.

19. Plaintiff alleges alternatively that each employee defendant approved in advance the actions taken by each other defendant or, after the conduct was undertaken, intentionally and with full knowledge thereof ratified, approved, or condoned and benefited from the actions of every other defendant, thereby adopting it as their own.

/ / /

---

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

20. Plaintiff repeats and re-alleges the paragraphs as set forth hereinabove and incorporates by reference all allegations as though fully set forth herein.

21. GREYSTAR holds itself out to provide property management services, among other things, and provides those services to KILROY for the One Paseo apartments located in San Diego, California.

22. Plaintiff signed a lease with One Paseo Living with an effective date of March 26, 2020 and Plaintiff paid pro-rata March rent of $858.58 and $4,436.00 base rent. This was at the beginning of COVID and there were few tenants and few services at the complex, especially in Plaintiff's building. Plaintiff's toilet wasn't flushing properly on the first use by one of the movers. Because of COVID, it was not addressed immediately. An external plumbing company was eventually used, and one of the plumbers used a spear-like rod to pull out a dead rat and placed it into a large brown bag which he took into the hallway outside the apartment.

23. On or about September 2021, the then-current property manager, was transferred to another GREYSTAR location, and created a renewal rate for Plaintiff with a $44.00 /month increase in rent, effective November 1, 2021 set at $4,480. Plaintiff signed that renewal lease after delays from the front office generating it.

24. The Plaintiff paid the rent listed in the One Paseo payment system on November 1, 2021 for $4,436.00. On November 4, 2021, an additional base rent was added for $44.00 but never told Plaintiff that the amount was added. Upon discovery, Plaintiff paid the additional $44.00.

25. The One Paseo payment system is set up to charge rent and expenses on a monthly calendar basis.

26. On November 14, 2021, Plaintiff placed a maintenance request in the One Paseo maintenance tracking system for a leak in the washing machine and a

leak under the sink. When Plaintiff initially looked at apartments with employee Dan, a leasing agent, he stated everything in the apartment was new, so it seemed odd the machine wasn't under warranty. Employee Jeff from Maintenance arrived on November 15, 2021 and fixed the kitchen sink by re-screwing the pipe correctly, but he was not able to fix the washing machine. His supervisor, employee Jorge, also arrived in the unit a few times over the next few weeks but said he had no one with the expertise to install the part needed, even though Jeff stated they had already done several within the complex. During the week of December 13, 2021, employee Jeff arrived with the replacement part but he dropped it almost immediately and it broke. He returned during the later part of the week and disconnected the washing machine and took the washing machine cover off and performed a few tasks including wet vacuuming the appliance and something electrical. The dryer unit was also removed from the W/D closet and was placed directly in front of the second bedroom door to block any entry into Plaintiff's second bedroom. Employee Jeff never returned. Plaintiff spoke with employee Jorge, a supervisor, who told her that he would not replace the broken machine with a new washer and to do her laundry down the street. Employee Adriana from the front office was also involved. Plaintiff told Jorge she would buy her own replacement as more than 30 days had passed without a functioning washer-dryer appliance. Plaintiff bought a new washer/dryer which was delivered and installed on or around December 20, 2021.

27. The broken washer-dryer took up more than 50% of the intended purpose of the apartment from November 15, 2021 until on or about May 14, 2024, but Employee TBARR would not settle for the period in question.

28. Plaintiff sent several messages to One Paseo to pick up the broken machines over the years, but no one showed.

29. Plaintiff asked the front office for the current Property Manager's name or

contact information or to have him/her call Plaintiff, but Plaintiff never heard from any property manager until May 2024, despite several property managers holding that position during that time.

30. Eventually maintenance would send notices to enter apartments for other work or to check things. Maintenance would enter and refuse to take the broken units when they left. Over time they would state, "I'll let my manager know."

31. On or about August 2022 the front office notified Plaintiff that maintenance would be entering the apartment. When Plaintiff opened the door, employee Darian and employee David1 were turned talking to employee Jorge who stated, "See if she sold them." David1 and employee Darian entered apartment with an IPAD. The employee Darian asked if anything was wrong and I showed her the broken washer-dryer machine. I believe she took a photo. I believe employee David1 replaced the air filter. Then as the employee Darian went around the corner to stand in front of the washer-dryer closet, employee David1 stopped at the oven and began to push/pull on the right side of the oven handle. Plaintiff asked him what he was doing and he stood upright, looked Plaintiff in the eye, shrugged and smirked. The next time Plaintiff used the oven handle, the right side of the oven handle disconnected from the oven.

32. Plaintiff showed employee David1 and employee Darian the broken toilet and explained what the external plumbers did when they pulled the dead rat out. The employee Darian stated she would let management know. When they left, Plaintiff asked if they were going to remove the broken machines, the employee Darian stated she'd let her management know. No one ever showed to fixed the broken toilet or the oven handle.

33. On or about September 19, 2022 Peter left a notice to enter on Plaintiff's door and an appt was set up for him to return the next day to check the water meter. The next day, Plaintiff let Peter in and as they walked to the washer-dryer closet Peter said aloud to someone other than Plaintiff, "This is the old washer-

dryer and this is the new washer-dryer." He unscrewed a small cover in the washer-dryer closet ceiling. Plaintiff returned to the couch to work. Shortly after, employee Peter left the unit and returned. Shortly after, a strange noise occurred and Plaintiff went over to the washer-dryer area. Employee Peter had opened the spare bathroom door and began to fill an orange Home Depot bucket with water from the bath. Plaintiff explained that he cannot just open any door in the unit, and then walked to the water meter. He pointed to a piece of paper and said, "No. no.no." Plaintiff asked, "What's that smell? It smells like stale water." Employee Peter shrugged his shoulders and left. Plaintiff woke up about 4:00am that night with a headache and there was smell from the washer-dryer closet. The washer-dryer had been moved inside the closet and it looked like the waste exit pipe was now exposed from the drainage hole. Plaintiff had no access to the maintenance reporting system as it would not allow her to log into the system. Plaintiff sent an email instead. The next day Plaintiff saw employee Peter in the hallway and asked what he did. Peter looked at the floor and would not respond. The waste exit pipe remains exposed as of this filing. Plaintiff covered the washer-dryer closet door with plastic garbage bags and tape in an attempt to keep the smells out of the apartment. Again, no response from the front office or maintenance. Plaintiff remembers employee Jeff told her that "they do everything, but the water meter" as "we can't touch that." Jeff was re-located, presumably to another GREYSTAR managed complex. Employees re-locate all the time seemingly to other GREYSTAR locations. If something goes wrong, the person gets transferred to another location. After mentioning to an employee that enters the apartment someone's name that was part ongoing issues, they typically say, "they're not here anymore." Plaintiff could not even get an employee to give her the property manager's name for escalation.

34. On or about September 13, 2022 Plaintiff's rent was increased as a charge

appeared in the system which eventually turned out to be "a building loss protection fee." Plaintiff initially auto-paid the rental bill but ceased doing so after she noticed this charge that the front office had never disclosed to Plaintiff prior. This monthly charge was also charged on October 11, 2022, November 11, 2022 and December 6, 2022. On January 2, 2023, a credit for $60.00 appeared from the front office for $60.00. The December's charge follows several emails and phone calls, and the timing difference with the other three months suggests an accelerated application of the charge for December.

35. On December 1, 2022, the front office raised rent again to $4,926.00, a $446.00 rent increase.

36. On or about May 13, 2024, Fire inspectors came with a GREYSTAR employee to enter without notice, apparently because there was nothing in the paperwork on inspection in the second bedroom. Plaintiff opened the door and said, "it's blocked." The fire inspector repeated, "it's blocked" as he walked away. That inspector was only looking to view the second bedroom and not the washer-dryer room. Shortly after, employee TBARR and employee Christoph visited Plaintiff's apartment and saw the washer-dryer out in the open. During our discussion, they stated it was an emergency for them to get into the taped shut washer-dryer room to ensure there was no leak from the sprinkler. Plaintiff explained she was preserving evidence and eventually allowed employee Christoph to peak in the right side of the washer-dryer closet so he could look at the fire sprinkler, requiring to peel off the sealed tape for the toxic smells. He was told not to touch anything. After further discussion about the washer-dryer, two men (employees) stormed through the front door unexpectedly, without knocking, and started removing the broken washer-dryer appliance unit. Plaintiff had all four people sign in. Plaintiff announced she would record with her phone " so there is no dispute on when this was removed." Plaintiff made an appointment with Chirstoph for him to return the next morning at 9:00am

with the fire inspector, but no one showed or called. Neither did Theresa when I emailed her that "No one showed. No one called."

37. On or about March 1, 2024, Plaintiff paid $4,926 for base rent on a MTM lease, so Plaintiff had paid for the monthly term already. Employee TBARR raised rent mid-month to $5,413.00, a $487 increase per month. On March 15, 2024, there was a base rent increase of $267.06 which is the pro-rated mid-month increase, and front office employees refused repeated explanations that they cannot change the rent rate mid-month, especially on a MTM term as every month is the term period. In addition, employee Emerson (email was Emerson J) would not provide me with the property managers name or email or the formula used to calculate that rent, and apparently failed to escalate per Plaintiff request.

38. On or around January 14, 2025, Plaintiff reached out to CEO AMAN, as landlord, but she never responded to Plaintiff and new issues have continued. This email included a photo of the broken washer/dryer unit blocking entry to Plaintiff's second bedroom and the other in the main living area. It also included several critical emails to support egregious and unconscionable ongoing issues Plaintiff faced at KILROY's One Paseo property, and the need for an escalation to the CEO level for assistance in resolution. She failed to respond to Plaintiff within 30 days to correct the issue, and she has continued to fail to respond as of filing.

39. The payment system for March and April of 2025 listed $4,926.00 as the base rate which Plaintiff paid in full respectively. After April rent payment, the front office added two more base rates of $1,822.00 each and retro-posted it as April 2, 2025, for a post-payment rental increase for March 2025 and April 2025, for a net increase of $3,644.00. This is an action of financial fraud.

40. As of April 2, 2025, the rates had not raised in the payment system. Plaintiff paid the rate in the system and received confirmation. Later in the day,

employee TBARR changed, or had another employee change, the pricing in the system for the monthly rate and also posted an increase to be back paid for the previous two months.

41. On April 4, 2025, a new notice for increase rent was posted to the Plaintiff's door, increasing for the month to month (MTM) rate this time set at $7700/month. This will represent a 74% base rent increase since initial signing at One Paseo on March 26, 2020.

42. On or around April 7, 2025, employee TBARR left a "notice to pay or quit document" on Plaintiff's door. This was false and Plaintiff sent a note stating she was waiting for the delivery of the court documents, which never arrived. Plaintiff had already paid rent according to the amount stated per the One Paseo payment system rent on April 2, 2025, prior to employee TBARR changing the rate in the system. Employee TBARR then posted an additional $1,822.00 for March 2025 and $1,822.00 for April 2025 which were back-dated to their respective month. Those charges were restated again in the One Paseo payment system as charges for May 2025 and were posted for a net monthly rent for May of $10,984.57. The One Paseo payment system only allows for the payment amount posted by One Paseo and there was no way to pay the rent absent the back-dated erroneous charges. Plaintiff sent a note to employee TBARR stating that the back-dated charges were illegal, and paid the full amount with a note stating that those charges would be disputed.

43. For the May 2, 2025 payment, including base rate, the two $1,822 payment applied post payment for March and April, as well as associated rent expenses and credit card payment fees, were consolidated into May for a net payment $11,308.61. The credit card charge is 2.9%, which for the retro-charging action, generated a $324.04 charge.

44. The higher this rent reaches, the higher the percentage of payment with a credit card are for proof of payment and dates incurred by Plaintiff, which are

required given all of the issues from all Defendants.

45. Since the original complaint was filed the second bathroom toilet has had a replacement to the flushing component and appears to be fixed.

46. Since the original complaint was filed the notification of a rent increase on August 1, 2025 has not been implemented.

47. Since the original complaint was filed Employee Julian entered the apartment for an annual inspection and attempted to pull the oven handle completely off the oven. There was no contact from the property manager or the supervisor of the maintenance regarding this act. Plaintiff believes Employee Julian is from another GREYSTAR location in San Diego.

48. The employees that Plaintiff identified in emails by name as being active in the issue were, iin some instances, moved to another location or promoted.

## **FIRST CAUSE OF ACTION**

### **VIOLATION OF FEDERAL HOUSING ACT**

### **42 U.S.C § 3601 *et seq.* (Discrimination based on Sex)**

49. Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

50. All claims are based on the belief of Plaintiff.

51. Defendants violated the Federal Housing Act in their discrimination of Plaintiff based on her status of sex as a woman.

52. The Fair Housing Act (FHA) prohibits discrimination based on sex as it relates to unequal terms or condition in the sale or rental process, discriminatory pricing disproportionately against women, and/or refusing to sell or rent housing based on a person's sex.

53. The Defendants have violated the FHA on multiple occasions with regard to unequal terms or conditions in the rental process, discriminatory pricing disproportionally against Plaintiff who is a woman, and refusing to rent the housing option that she is qualified to rent, a two-bedroom apartment, based on

the fact that she is a woman.

54. Plaintiff moved into a penthouse unit at the One Paseo Village apartments in March 2020, which coincided with the pre-COVID opening of that building.

55. In September 2021 there was a change in outsourced property management personnel under the GREYSTAR family of companies in support of their property management services for KILROY.

56. A new lease followed on November 1, 2021 with an increase of $44.00/month, which had been negotiated with the previous property manager who had been transferred from One Paseo Village to a different GREYSTAR property.

57. The original lease and the new lease at One Paseo Village apartments were signed with KILROY, the landlord, and any liability for a breach of those leases lie with the company.

58. On November 14, 2021, the property provided washer-dryer unit broke and the GREYSTAR employees refused to replace it. After 30 days had passed, on December 20, 2021, Plaintiff personally replaced washer-dryer unit and asked multiple times for the broken washer-dryer to be removed. The broken washer-dryer unit affected more than 50% of the intended use of the apartment.

59. The broken washer-dryer unit remained in the apartment affecting access until May 2024. Despite pleas to GREYSTAR's property management service employee to remove the washer-dryer unit, provide her with the name and contact information of the property manager, escalate to CEOs of KILROY and GREYSTAR, and to retain an attorney.

60. In September 2022, the GREYSTAR maintenance employees sent Employee Peter to Plaintiff's apartment to break her personal replacement washer-dryer rendering it unusable and continues to be unusable as of this second amended complaint. Plaintiff has been without a functioning washer-dryer unit in her penthouse apartment since November 14, 2021, except for a short period when her personal washer-dryer machine was functioning.

61. There have also been two separate instances of GREYSTAR maintenance employees entering the apartment under false pretenses to gain access to the apartment and then damaging the oven. In the first instance, Employee David1 disconnected the right handle to make using the oven difficult. The second instance occurred in June 2025, after the original complaint had been filed in which he attempted to tear the oven handle off completely.

62. On December 1, 2022, the front office raised rent again to $4,926.00, a $446.00 rent increase.

63. On or about March 1, 2024, Employee TBARR raised rent mid-month to $5,413.00 on a month-to-month, a $487 increase per month. On March 15, 2024, there was a base rent increase of $267.06 which is the pro-rated mid-month increase, and front office employees refused repeated explanations that they cannot change the rent rate mid-month, especially on a MTM term as every month is the term period.

64. In November 2024, property (general) manager TBARR provided a rent notification for a $1,800.00/month rent increase. Plaintiff believes these rent notification and increases are generated by one of the GREYSTAR companies -- either/both Greystar Management Services, LLC and Greystar California, Inc., d/b/a "Greystar," a corporation;

65. Plaintiff sent a personal email to new CEO KILROY Angela Aman ("AMAN") on January 14, 2025 with ten (10) attachments concerning "serious issues" going on at One Paseo Living including "four years of unresolved and escalating issues at One Paseo Living," critical support correspondences with the GREYSTAR property management employees, specifying that the base rent was to be increased to $7,235.00/month ($1,822,00/month), and that these issues needed her immediate attention. One of the attachments included a photo of the two broken washer-dryer units left out in Plaintiff's apartment blocking access within the apartment. She has never acknowledged or responded as of

this second amended complaint.

66. The rental payment system for March and April of 2025 listed $4,926.00 as the base rate which Plaintiff paid in full respectively.

67. After April rent payment was paid, the front office added two more base rates of $1,822.00 each and retro-posted it as April 2, 2025, for a post-payment rental increase for March 2025 and April 2025, for a net increase of $3,644.00, effectively retro-charging for previous months already paid. GREYSTAR Employee TBARR is the property (general) manager and is responsible for these actions.

68. On April 4, 2025, a new notice for increase rent was posted to the Plaintiff's door, increasing for the month to month (MTM) rate this time set at $7700/month to start in August 2025. This will represent a 74% base rent increase since initial signing at One Paseo on March 26, 2020. As of the second amended complaint this increase has not yet been applied.

69. On or around April 7, 2025, employee TBARR left a "notice to pay or quit document" on Plaintiff's door. This was false and Plaintiff sent a note stating she was waiting for the delivery of the court documents, which never arrived.

70. Employee TBARR then re-posted the additional $1,822.00 for March 2025 and $1,822.00 for April 2025 and were posted for a net monthly rent for May of $10,984.57. The One Paseo payment system only allows for the payment amount posted by One Paseo and there was no way to pay the rent absent the back-dated erroneous charges. Plaintiff sent a note to employee TBARR stating that the back-dated charges were illegal, and paid the full amount with a note stating that those charges would be disputed.

71. Mid-month in April 2025 there was a noticeable movement of female tenants moving out of their two-bedroom apartments and into one-bedroom apartments. Not men, only women. Plaintiff's understanding is that two-bedroom apartments are for families and single women need to move to one-

bedroom apartments. This is discrimination.

72. For the May 2, 2025 payment, including base rate, the two $1,822 payment applied post payment for March and April, as well as associated rent expenses and credit card payment fees, were consolidated into May for a net payment $11,308.61. The credit card charge is 2.9%, which for the retro-charging action, generated a $324.04 charge.

73. The rental amount of $7,235.00/month has remained in place. For the three (3) months between May 2, 2025 and August 2, 2025, Plaintiff paid $45,000.00 for monthly rent and associated charges.

74. CEO JOHNJR and CEO AMAN should be held personally responsible as the actions taken by outsourced GREYSTAR personnel involved deliberate, fraudulent or illegal conduct and can therefore be held personally liable.

75. In addition, if the breach of the lease also involved an intentional tort (a wrongful act that causes harm) committed by the CEO, the CEO can be personally liable, even if they occurred in a corporate capacity. Plaintiff sent KILROY CEO AMAN a direct email with 10 critical attachments, including specifics regarding the rate increases and property manager TBARR's actions, among others. AMAN did nothing to prevent the $1,822.00/month increase, the attempted eviction by TBARR, Employee Julian's efforts to dismantle Plaintiff's oven handle, or the lawsuit filing in general. She should be held personally responsible for the events under her tenure as they could have all been prevented.

76. GREYSTAR should be held responsible as it was GREYSTAR employees that discriminated, harassed, retaliated, entered Plaintiff's apartment under false pretenses, broke property and personal appliances, as well as other claims and/or crimes.

77. CEO BFAITH should be held personally responsible as the chronic and systematic conduct taken by his own GREYSTAR employees involved in

deliberate, fraudulent and/or illegal conduct. This conduct is consistent across employees, some coming from other locations. If BFAITH wanted this behavior to stop, it would stop, but he appears to reward this behavior though bonuses and by not firing the employees, but merely moving them to other GREYSTAR locations or promoting them from within. Therefore, he should be held personally liable. These FHA violations are long term and ongoing issues that GREYSTAR and BFAITH caused and continue to cause even after the original complaint.

78. BFAITH should be held personally responsible because when you start up a business and run a business of your own, the company takes its direction from you. Plaintiff believes that BFAITH supports and rewards through bonuses the actions taken by the GREYSTAR employees. There is not one rogue GREYSTAR employee, it is all of them. They rotate in and out between GREYSTAR properties and none of them are held accountable for their actions. When David1 first broke Plaintiff's oven handle, Plaintiff asked him what he was doing. He walked right up to her face, smirked and then walked away. These employee know exactly what they are doing is wrong. They work together. The common denominator, the one who sets the culture, is the CEO BFAITH. Plaintiff overheard two GREYSTAR employees talking as one turned to the other and stated, "We can do anything to them, and there is nothing they can do about it."

79. This facts show how Defendant(s) have violated the FHA on multiple occasions. They have provided Plaintiff unequal terms or conditions in the rental process, discriminatory pricing disproportionately against women as Plaintiff is a woman, and/or refusing to rent housing based on a person's sex (female). Plaintiff believes that "refusing to rent" outright and "refusing to rent" on equal terms are both "refusing to rent."

80. Defendants have discriminated against Plaintiff, a woman, through chronic and

systemic conduct throughout the duration of Plaintiff's six (6) year tenancy at the One Paseo apartment complex.

81. The Defendants was a substantial factor in causing Plaintiff's discrimination as a woman for housing services and is a violation of rights under the FHA.

82. Plaintiff seeks all available damages including compensatory and punitive damages. Civil penalties of at least $25,000 paid to the government should be considered. Declaratory and injunctive relief are sought to compel Defendants to prevent further irreparable harm to the Plaintiff, and establish legal anti-discrimination rights under discrimination laws. Finally, reasonable attorney fees and court litigation costs.

## SECOND CAUSE OF ACTION

## VIOLATION OF FEDERAL CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS

## 42 U.S.C. § 1985

83. Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

84. All claims are based on the belief of Plaintiff.

85. Defendants violated the Federal Conspiracy to Interfere with Civil Rights against Plaintiff when more than one of the Defendants and/or their employees worked together to deny Plaintiff equal protection under the laws and/or to injure her or her property.

86. The Federal Conspiracy to Interfere with Civil Rights, 42 U.S.C. §1985(2), states that "two or more persons will be considered to have conspired to impede, hinder, obstruct, or defeat, the due course of justice if such person conspires to deny any citizen the equal protection of the laws, or injure his/her or his/her property for lawfully enforcing the right of any person, or class of persons, to the equal protection of the laws."

87. Defendants have discriminated against Plaintiff based on her sex as a women

through chronic and systemic conduct in violation of the FHA as outlined in First Cause of Action herein throughout the duration of Plaintiff's six (6) year tenancy at the One Paseo apartment complex. All Defendants have contributed in some respect to support the "two or more persons" requirement to conspire to deny any citizen equal protection under the laws.

88. All Defendant(s) outlined in the First Cause of Action are participants in the conspiracy as they were all involved in some shape or form if they can be tied to the violation of the FHA because the conspiracy is about the conspiracy to interfere with civil rights. A violation of FHA is a civil rights violation.

89. The conduct occurred with almost every single interaction from a Greystar employee since October 2021. This is a conspiracy that all of the relevant One Paseo employees knew about and their actions were in furtherance of that conspiracy.

90. In December 2021, Employee Jeff was working on the broken washer-dryer appliance and he said to Plaintiff, "We're sitting around the table trying to figure out what to do with you." Plaintiff believes the GREYSTAR employees included Supervisor Jorge, Employee Jeff, Employee Adriana Medina, the then-current property manager (name never provided), Employee Conor, and perhaps a few other employees.

91. In an email from January 2022, Employee Adriana stated that Plaintiff did not have approval or permission to have a new washer-dryer installed in the unit after Employee Jeff broke the one provided by the property. Plaintiff purchased the new washer-dryer after 30 days had passed, and after Supervisor Jorge told Plaintiff to do laundry down the street, presumably at the local laundromat. Plaintiff suspects all property managers had this information passed down to them, perhaps in a tenant file, as Plaintiff could not get the name of the property managers, much less get them to respond or address the situation, between September 2021 to May 2024. This is a theme that continues with the

current property manager, TBARR, today. While she had the broken washer-dryer removed in May 2024, she refused to settle on the time access to the bedroom was blocked and the broken units were in the open.

92. Harassment and the broken washer-dryer in the apartment and blocking the second bedroom continued across each subsequent property manager and employee for years until TBARR finally removed it in May 2024.

93. In addition, there were four instances where maintenance employees entered the apartment under false pretenses to check something or fix/replace something and proceeded to damage either the oven or one of the washer-dryer units. These instances are address elsewhere in the second amended complaint. Someone had to solicit their involvement (property manager and/or maintenance manager) as Plaintiff believes some of these employees were from other GREYSTAR locations. They had to know their behavior was criminal as breaking an appliance is a criminal act, and could be a felony. Employee Jeff, Employee David1, Employee Peter, and Employee Julian participated in the conspiracy.

94. At one point, Employee Gary stopped by the check the serial number on the back of the washer-dryer unit. But Plaintiff's was broken sitting out in the Plaintiff's apartment and he did not check them. Plaintiff looked for the serial number but it wasn't on the back of the unit, it was inside the circular drum in the front of the washer-dryer units. If Plaintiff was the last tenant to have the serial numbers checked, one would think the maintenance staff would know where the serial numbers were located.

95. KILROY CEO AMAN knew of the GREYSTAR Employees conduct at One Paseo Village in January 2025 because evidence was included in the email from Plaintiff. At that point, CEO AMAN and KILROY had knowledge of the conspiracy, and her actions/inactions after gaining that knowledge become critical. There was really no one else for Plaintiff to escalate to. By AMAN's

lack of response to Plaintiff and her inaction to address the issues including to fix the $1822.00/month rate hike, she aided in the implementation of that rate hike, and the two months retro-charging. The inaction also aided TBARR to deliberately deliver the 3-day eviction notice to Plaintiff and falsely accuse Plaintiff of non-payment. In addition, she was served with the original complaint of this lawsuit and she has still done nothing to correct the issues in the January email or the original complaint filed in May 2025.  Her overt actions/lack of actions have only furthered the conspiracy's goal. She could have changed the rental rate back to $4,400/month when she received the original complaint, but she just let it continue. In the three (3) months between May 2, 2025 and August 2, 2025, Plaintiff paid One Paseo Village $45,000 for rent, and she still does not have an operating washer-dryer in what is likely the hottest summer on record. She is participating in the conspiracy.

96. The conduct of the defendants were a substantial factor in the conspiracy against the Plaintiff's and each action was in furtherance of that conspiracy.

97. Plaintiff seeks all available damages including compensatory damages, non-economic damages (emotional distress, pain and suffering), and punitive damages.  Declaratory and injunctive relief are sought to compel ALL Defendants to prevent irreparable harm to the Plaintiff, and establish legal rights under civil rights laws. Plaintiff is entitled to payment of penalties according to proof, interests, attorney fees, and costs as permitted by statute.

### THIRD CAUSE OF ACTION

### VIOLATION OF UNRUH CIVIL RIGHTS ACT,

### Cal. Civ. Code § 51 (Discrimination Based on Sex)

98. Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

99. All claims are based on the belief of Plaintiff.

100.    Defendants violated the Unruh Civil Rights Act in their discrimination

*Saitta v. Greystar* Real Estate Partners LLC
Second Amended Complaint
23

against Plaintiff based on her status of sex as a woman.

101.    The Unruh Civil Rights Act, part of California Civil Code § 51(b) states that "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." This means businesses cannot discriminate against individuals including areas like service and pricing. The term "sex" expressly includes discrimination based on gender.

102.    The Defendants have violated the Unruh Civil Rights Act on multiple occasions with regard to unequal treatment in the rental process, discriminatory pricing disproportionally against Plaintiff who is a woman, and refusing to rent the housing option that she is qualified to rent, a two-bedroom apartment, based on the fact that she is a woman.

103.    Plaintiff moved into a penthouse unit at the One Paseo Village apartments in March 2020, which coincided with the pre-COVID opening of that building.

104.    In September 2021 there was a change in outsourced property management personnel under the GREYSTAR family of companies in support of their property management services for KILROY.

105.    A new lease followed on November 1, 2021 with an increase of $44.00/month, which had been negotiated with the previous property manager who had been transferred from One Paseo Village to a different GREYSTAR property.

106.    The original lease and the new lease at One Paseo Village apartments were signed with KILROY, the landlord, and any liability for a breach of those leases lie with the company.

107.    On November 14, 2021, the property provided washer-dryer unit broke and the GREYSTAR employees refused to replace it. After 30 days had passed, on December 20, 2021, Plaintiff personally replaced washer-dryer unit and asked

multiple times for the broken washer-dryer to be removed. The broken washer-dryer unit affected more than 50% of the intended use of the apartment.

108.    The broken washer-dryer unit remained in the apartment affecting access until May 2024. Despite pleas to GREYSTAR's property management service employee to remove the washer-dryer unit, provide her with the name and contact information of the property manager, escalate to CEOs of KILROY and GREYSTAR, and to retain an attorney.

109.    In September 2022, the GREYSTAR maintenance employees sent Employee Peter to Plaintiff's apartment to break her personal replacement washer-dryer rendering it unusable and continues to be unusable as of this second amended complaint. Plaintiff has been without a functioning washer-dryer unit in her penthouse apartment since November 14, 2021, except for a short period when her personal washer-dryer machine was functioning.

110.    There have also been two separate instances of GREYSTAR maintenance employees entering the apartment under false pretenses to gain access to the apartment and then damaging the oven. In the first instance, Employee David1 disconnected the right handle to make using the oven difficult. The second instance occurred in June 2025, after the original complaint had been filed in which he attempted to tear the oven handle off completely.

111.    On December 1, 2022, the front office raised rent again to $4,926.00, a $446.00 rent increase.

112.    On or about March 1, 2024, Employee TBARR raised rent mid-month to $5,413.00 on a month-to-month, a $487 increase per month. On March 15, 2024, there was a base rent increase of $267.06 which is the pro-rated mid-month increase, and front office employees refused repeated explanations that they cannot change the rent rate mid-month, especially on a MTM term as every month is the term period.

113.    In November 2024, property (general) manager TBARR provided a rent

notification for a $1,800.00/month rent increase. Plaintiff believes these rent notification and increases are generated by one of the GREYSTAR companies -- either/both Greystar Management Services, LLC and Greystar California, Inc., d/b/a "Greystar," a corporation;

114.    Plaintiff sent a personal email to new CEO KILROY Angela Aman ("AMAN") on January 14, 2025 with ten (10) attachments concerning "serious issues" going on at One Paseo Living including "four years of unresolved and escalating issues at One Paseo Living," critical support correspondences with the GREYSTAR property management employees, specifying that the base rent was to be increased to $7,235.00/month ($1,822,00/month), and that these issues needed her immediate attention. One of the attachments included a photo of the two broken washer-dryer units left out in Plaintiff's apartment blocking access within the apartment. She has never acknowledged or responded as of this second amended complaint.

115.    The rental payment system for March and April of 2025 listed $4,926.00 as the base rate which Plaintiff paid in full respectively.

116.    After April rent payment was paid, the front office added two more base rates of $1,822.00 each and retro-posted it as April 2, 2025, for a post-payment rental increase for March 2025 and April 2025, for a net increase of $3,644.00, effectively retro-charging for previous months already paid. GREYSTAR Employee TBARR is the property (general) manager and is responsible for these actions.

117.    On April 4, 2025, a new notice for increase rent was posted to the Plaintiff's door, increasing for the month to month (MTM) rate this time set at $7700/month to start in August 2025. This will represent a 74% base rent increase since initial signing at One Paseo on March 26, 2020. As of the second amended complaint this increase has not yet been applied.

118.    On or around April 7, 2025, employee TBARR left a "notice to pay or quit

document" on Plaintiff's door. This was false and Plaintiff sent a note stating she was waiting for the delivery of the court documents, which never arrived.

119.    Employee TBARR then re-posted the additional $1,822.00 for March 2025 and $1,822.00 for April 2025 and were posted for a net monthly rent for May of $10,984.57. The One Paseo payment system only allows for the payment amount posted by One Paseo and there was no way to pay the rent absent the back-dated erroneous charges.   Plaintiff sent a note to employee TBARR stating that the back-dated charges were illegal, and paid the full amount with a note stating that those charges would be disputed.

120.    Mid-month in April 2025 there was a noticeable movement of female tenants moving out of their two-bedroom apartments and into one-bedroom apartments. Not men, only women. Plaintiff's understanding is that two-bedroom apartments are for families and single women need to move to one-bedroom apartments. This is discrimination.

121.    For the May 2, 2025 payment, including base rate, the two $1,822 payment applied post payment for March and April, as well as associated rent expenses and credit card payment fees, were consolidated into May for a net payment $11,308.61. The credit card charge is 2.9%, which for the retro-charging action, generated a $324.04 charge.

122.    The rental amount of $7,235.00/month has remained in place. For the three (3) months between May 2, 2025 and August 2, 2025, Plaintiff paid $45,000.00 for monthly rent and associated charges.

123.    CEO JOHNJR and CEO AMAN should be held personally responsible as the actions taken by outsourced GREYSTAR personnel involved deliberate, fraudulent or illegal conduct and can therefore be held personally liable.

124.    In addition, if the breach of the lease also involved an intentional tort (a wrongful act that causes harm) committed by the CEO, the CEO can be personally liable, even if they occurred in a corporate capacity. Plaintiff sent

KILROY CEO AMAN a direct email with 10 critical attachments, including specifics regarding the rate increases and property manager TBARR's actions, among others. AMAN did nothing to prevent the $1,822.00/month increase, the attempted eviction by TBARR, Employee Julian's efforts to dismantle Plaintiff's oven handle, or the lawsuit filing in general. She should be held personally responsible for the events under her tenure as they could have all been prevented.

125. GREYSTAR should be held responsible as it was GREYSTAR employees that discriminated, harassed, retaliated, entered Plaintiff's apartment under false pretenses, broke property and personal appliances, as well as other claims and/or crimes.

126. CEO BFAITH should be held personally responsible as the chronic and systematic conduct taken by his own GREYSTAR employees involved in deliberate, fraudulent and/or illegal conduct. This conduct is consistent across employees, some coming from other locations. If BFAITH wanted this behavior to stop, it would stop, but he appears to reward this behavior though bonuses and by not firing the employees, but merely moving them to other GREYSTAR locations or promoting them from within. Therefore, he should be held personally liable. These FHA violations are long term and ongoing issues that GREYSTAR and BFAITH caused and continue to cause even after the original complaint.

127. BFAITH should be held personally responsible because when you start up a business and run a business of your own, the company takes its direction from you. Plaintiff believes that BFAITH supports and rewards through bonuses the actions taken by the GREYSTAR employees. There is not one rogue GREYSTAR employee, it is all of them. They rotate in and out between GREYSTAR properties and none of them are held accountable for their actions. When David1 first broke Plaintiff's oven handle, Plaintiff asked him

what he was doing. He walked right up to her face, smirked and then walked away. These employee know exactly what they are doing is wrong. They work together. The common denominator, the one who sets the culture, is the CEO BFAITH. Plaintiff overheard two GREYSTAR employees talking as one turned to the other and stated, "We can do anything to them, and there is nothing they can do about it."

128.    This facts show how Defendant(s) have violated the Unruh Civil Rights Act on multiple occasions with regard to unequal treatment in the rental process, discriminatory pricing disproportionally against Plaintiff who is a woman, and refusing to rent the housing option that she is qualified to rent, a two-bedroom apartment, based on the fact that she is a woman.

129.    Defendants have discriminated against Plaintiff, a woman, through chronic and systemic conduct throughout the duration of Plaintiff's six (6) year tenancy at the One Paseo apartment complex.

130.    The Defendants were a substantial factor in causing Plaintiff's discrimination as a woman with regard to services and pricing during her tenancy at One Paseo Living. It is a violation of rights under the Unruh Civil Rights Act.

131.    Plaintiff seeks all available damages including compensatory and punitive damages. Statutory damages of at least $4,000 per violation (or up to three times the actual damages).  Declaratory and injunctive relief are sought to compel Defendants to prevent further irreparable harm to the Plaintiff, and establish legal anti-discrimination rights under discrimination laws. Finally, reasonable attorney fees and court litigation costs.

## FOURTH CAUSE OF ACTION

## VIOLATION OF THE TOM BANE CIVIL RIGHTS ACT

### Cal. Civ. Code § 52.1

132.    Plaintiff incorporates by reference each and every allegation in the

foregoing paragraphs of this Complaint.

133.    All claims are based on the belief of Plaintiff.

134.    Defendants violated the Tom Bane Civil Rights Act against Plaintiff's constitutional and statutory rights through threats, intimidation, and coercion.

135.    The Tom Bane Civil Rights Act prohibits interfering with a person's constitutional or statutory rights through threats, intimidation, coercion, or violence to interfere with these rights without regard to whether the victim is a member of a protected class.

136.    The actions of GREYSTAR employees through threats, intimidation, and coercion interfered with Plaintiff's constitutional and/or statutory rights through threats, intimidation, and coercion.

137.    Threats, intimidation and coercion have come from comments from GREYSTAR employees, from actions like leaving a broken washer-dryer in the apartment for years affecting the use or purpose of the apartment, in four (4) instances of maintenance employees breaking or tampering with appliance provided by One Paseo Living or by Plaintiff, threats from TBARR concerning eviction without cause, increases in rent inconsistent with property or rental market overall, harassment and punishment from GREYSTAR employees where they fail to respond or just ignore entirely, when they break an appliance and then look you in the eye and smirk,

138.    In December 2021, Employee Jeff was working on the broken washer-dryer appliance and he said to Plaintiff, "We're sitting around the table trying to figure out what to do with you." Plaintiff believes the GREYSTAR employees included Supervisor Jorge, Employee Jeff, Employee Adriana Medina, the then-current property manager (name never provided), Employee Conor, and perhaps a few other employees.

139.    In an email from January 2022, Employee Adriana stated that Plaintiff did not have approval or permission to have a new washer-dryer installed in the

unit after Employee Jeff broke the one provided by the property. Plaintiff purchased the new washer-dryer after 30 days had passed, and after Supervisor Jorge told Plaintiff to do laundry down the street, presumably at the local laundromat. Plaintiff suspects all property managers had this information passed down to them, perhaps in a tenant file, as Plaintiff could not get the name of the property managers, much less get them to respond or address the situation, between September 2021 to May 2024. This is a theme that continues with the current property manager, TBARR, today. While she had the broken washer-dryer removed in May 2024, she refused to settle on the time access to the bedroom was blocked and the broken units were in the open.

140.     Harassment and the broken washer-dryer in the apartment and blocking the second bedroom continued across each subsequent property manager and employee for years until TBARR finally removed it in May 2024.

141.     In addition, there were four instances where maintenance employees entered the apartment under false pretenses to check something or fix/replace something and proceeded to damage either the oven or one of the washer-dryer units. These instances are address elsewhere in the second amended complaint. Someone had to solicit their involvement (property manager and/or maintenance manager) as Plaintiff believes some of these employees were from other GREYSTAR locations. They had to know their behavior was criminal as breaking an appliance is a criminal act, and could be a felony. Employee Jeff, Employee David1, Employee Peter, and Employee Julian participated in the conspiracy.

142.     TBARR sent Plaintiff an erroneous "notice to pay rent or quit" on or about April 7, 2025. Plaintiff sent multiple emails during the course of April 2025 stating that she was awaiting the proper court documents, but employee TBARR never sent and apparently did not actually file the eviction notice in the court.

143.    Plaintiff had already paid rent according to the amount stated per the One Paseo payment system rent on or about April 2, 2025, prior to employee TBARR changing the rate in the system to increase per month rent by $1,822.00/month including a two (2) month retro-charge. This is on top of the $1,000/month Plaintiff was already paying for rent. The new rate has been applied to six (6) months of rent already

144.    The Defendants conduct was a substantial factor in causing interference with Plaintiff's rights and is a violation of rights under The Tom Bane Civil Rights Act.

145.    Plaintiff seeks all available damages including compensatory and punitive damages. Civil penalties of at least $25,000 paid to the government should be considered.  Declaratory and injunctive relief are sought to compel Defendants to prevent further irreparable harm to the Plaintiff, and establish legal anti-discrimination rights under discrimination laws. Finally, reasonable attorney fees and court litigation costs.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT
## Cal. Civ. Code § 1942

146.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

147.    All claims are based on the belief of Plaintiff.

148.    Defendants breached the lease agreement with Plaintiff on multiple occasions over a long duration when they failed to perform their contractual obligations.

149.    A breach of contract occurs when there is a valid contract, the plaintiff performed their duties or had a valid excuse for not performing, the defendant failed to perform their contractual obligations, and the plaintiff suffered damages as a direct result of the defendants rbeach.

150.    There have been ongoing breach of contract issues. A few are listed below.

151.    There was a valid lease contract between Plaintiff and KILROY beginning in March 2020, and a subsequent agreement beginning November 1, 2021.

152.    The Plaintiff has paid all rental amounts on time.

153.    During the first month of the second agreement, Employee Jeff broke the property provided washer-dryer and left it out in the open of the apartment and blocking the second bedroom. The washer-dryer was not repaired or replaced in a 30 day time frame. At that point the lease agreement was breached. No reason was given for the maintenance and front office team not to perform their obligations. The property manager never called or stopped by to address the issue with Plaintiff.

154.    With regard to the failure of GREYSTAR to repair/replace the broken washer-dryer appliance from 2021, the One Paseo maintenance group had 30 days repair after which they did not, and then accused Plaintiff of not having permission to replace with a personal machine since employee/supervisor Jorge informed Plaintiff he would not replace with a new machine and to do her laundry down the street.

155.    Plaintiff purchased a personal washer-dryer and had it installed after the 30 day period as statutory law allowed. She did not deduct the cost from rent. The One Paseo Living property management team refused to remove the washer-dryer machine that Employee Jeff broke and it remained in the apartment until May 2024. Daily breach of contract issues. In fact, no property manager addressed this issue until May 2024 when the broken washer-dryer was finally removed.

156.    Plaintiff suffered damages as a direct result of the defendants' breach because she had to purchase a new machine, Employee Peter broke the new machine, Plaintiff continues to be without a washer-dryer for years.

157.    There were four instances total where an individual from maintenance

enters the apartment under false pretenses then damages an appliance, either an oven or a washer-dryer. In June 2025, Employee Julian entered the apartment under the pretense of him conducting the annual inspection. Plaintiff believes he was brought in from another GREYSTAR property.

158.    In another example, current Property Manager TBARR has increased Plaintiff's rent from $4,436.00 in April 2020 to $7,334.84 in May 2025. The standard rate per the renewal letter was on or about $4,614.00 in May 2025. Plaintiff currently pays an extraordinary rate. Plaintiff's rate is based on MTM, but it is highly inappropriate for Plaintiff to sign a MTM lease with all of the outstanding and ongoing issues. Employee TBARR sent another rate increase notice on or about April 4, 2025 for $7,766.00 effective August 1, 2025. These increases are unconscionable.

159.    The egregious nature and the multiplicity of the breaches of contract beginning in 2022 and continuing through the ongoing litigation should warrant these CEOs take direct responsibility. This includes BFAITH, AMAN, and JOHNJR. KILROY is ultimately responsible as the landlord for the breach of contract. But BFAITH leads GREYSTAR in the property management efforts and all of the rate increases that his employees are participating in to evict a penthouse tenant that has done nothing wrong and pays her rent on time. It's not just one rogue GREYSTAR employee, it is all of them and that signals a corporate culture directive which points to the CEO.

160.    In addition, JOHNJR was the CEO when the agreement between KILROY and GREYSTAR was initially signed fro One Paseo Village. If the revenue generation possibilities for GREYSTAR in the agreement are tied to the actions of GREYSTAR employees then he too should directly be held responsible. As a CEO, the job requires some level of foreseeability into the downside of those incentives. In addition, he was the CEO of KILROY when the washer-dryer incident occurred, during the period when not one property manager would

respond to Plaintiff or address the issues. A CEO is responsible for the actions of outsourced staff from a company like GREYSTAR.

161.    In addition, Plaintiff sent an email to AMAN about the severity of the ongoing situation at One Paseo Village, including ten (10) attachments. She has never responded to Plaintiff. She forwarded it to GREYSTAR, the very people that were involved in the issue in the first place. As a result, $1800.00/month rate increases results, retro-charging results, another maintenance person damaged an appliance, a lawsuit was started with the court, and the Plaintiff still does not have a functioning washer-dryer. Plaintiff was required to pay $45,000 in the three (3) months between May 2, 2025 and August 2, 2025. This was all avaidable. She had an opportunity in January to adjust the rate back to $4,400.00, and another opportunity to do it in May. No movement on the issues. No response to Plaintiff. No reprocussions for the GREYSTAR employees. As the landlor's CEO, she is furthering the actions of the closest offenders.

162.    The defendants' conduct was a substantial factor in the breaches of contract against the Plaintiff's and each action was in furtherance of that breach.

163.    Plaintiff seeks all available damages, including compensatory, incidental, and consequential damages. The damage should include an amount that will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

164.    Declaratory and injunctive relief is sought to compel Defendants to fulfill their contractual obligations, to enforce equitable servitudes, and to prevent further irreparable harm to the Plaintiff.

/ / /

/ / /

/ / /

# SIXTH CAUSE OF ACTION

## JUST CAUSE EVICTION

### Cal. Civ. Code § 1946.2 (Wrongful Eviction)

165.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

166.    All claims are based on the belief of Plaintiff.

167.    Defendants' participation in wrongful eviction actions against Plaintiff in their attempts to force Plaintiff out without a proper legal process or just cause.

168.    In a wrongful eviction, the tenant is not required to leave immediately.  A wrongful eviction occurs when a landlord tries to force a tenant out without the proper legal process, which is illegal.

169.    Just Cause Eviction occurs when a landlord attempts to terminate a tenancy without just cause, particularly once the tenant has lived in the unit for twelve (12) months or more. This is part of the Tenant Protection Act, which One Paseo Village does not qualify for since new building structures are carved out of the Tenant Protection Act.

170.    Plaintiff is in year six (6) of her tenancy at One Paseo Village in a penthouse apartment. Logically, the longevity and the penthouse investment should warrant a Just Cause Eviction. Plaintiff has given no cause which is probably why so much effort is expended from the GREYSTAR employees in their ongoing attempts to remove her from the premises and/on the penthouse apartment.

171.    Plaintiff seeks all available damages, including compensatory, incidental, and consequential damages.

172.    Plaintiff requests an injunction to get KILROY's and GREYSTAR's employee to cease harassment and eviction efforts. In addition, Plaintiff requests the obligations contained in the lease contract and associated California laws are upheld by all parties, their subsidiaries, and their

employees.

## SEVENTH CAUSE OF ACTION

## PROHIBITION OF SELF-HELP EVICTION

### Cal. Civ. Code § 789.3 (Wrongful Eviction)

173.   Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

174.   All claims are based on the belief of Plaintiff.

175.   Defendants' participation in wrongful eviction actions against Plaintiff in their attempts to force Plaintiff out without a proper legal process and through self.-help eviction practices.

176.   California Code § 789.3(b) states that "A landlord shall not, with intent to terminate the occupancy under any lease or other tenancy or estate at will, however created, of property used by a tenant as her residence, willfully" and § 789.3(b)(1) to "prevent the tenant from gaining reasonable access to the property by changing the locks or using a bootlock or by any other similar method or device."

177.   Plaintiff was locked out of her apartment on April 26, 2025. Employee Brandon did bring her a new FOB key and open the door. However, there was mention that the FOB key was set to be active for 1,000 days and Plaintiff has been at the One Paseo apartment for well over 1,000 days. The timing of April 26th in conjunction with unfounded eviction issues from employee TBARR and associated dramatic rent increases brings that 1,000 days into question.

178.   Defendants were a substantial factor in the lockout of tenant against the Plaintiff, as they are the only ones with access to functionality of the FOBs.

179.   Plaintiff seeks all available damages, including actual damages, an amount not to exceed one hundred dollars ($100) for each day or part thereof the landlord remains in violation of this section.

/ / /

# EIGHTH CAUSE OF ACTION

## PROTECTION AGAINST RETALIATION

### Cal. Civ. Code  § 1942.5 (Wrongful Eviction)

180.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

181.    All claims are based on the belief of Plaintiff.

182.    Defendants' participation in wrongful eviction actions against Plaintiff in their attempts to force Plaintiff out without a proper legal process and in their long term retaliation actions.

183.    California Civil Code 1942.5(d) states that "it is unlawful for a lessor to increase rent, decrease services, cause a lessee to quit involuntarily, bring an action to recover possession, or threaten to do any of those acts, for the purpose of retaliating against the lessee . . . has lawfully and peaceably exercised any rights under the law."

184.    Plaintiff has had rent has been increased multiple times despite ongoing breach of contract issues, ongoing harassment, maintenance personnel break appliances owned by property and owned by Plaintiff, maintenance attempt flooding the apartment, exposed waste pipe issues, and  an unfunctioning toilet since the move-in day.

185.    Defendants continue to create an environment of hostility, little to no service with past issues (ie the broken washer-dryer visibly remained in unit May 2024 and the brand new washer-dryer remains unfunctional). Plaintiff has no functioning washer-dryer.

186.    Evidence will show that Plaintiff spent several years attempting to cure issues with GREYSTAR, and in January 2025 engaged KILROY though CEO AMAN unsuccessfully.

187.    The defendants conduct has been a substantial factor in the violation through retaliatory actions against the Plaintiff's and each action was in

furtherance of that violation.

188.    Plaintiff seeks all available damages. Damages should include actual and punitive damages, as well as attorney fees.

## NINETH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF QUIET ENJOYMENT

### Cal. Civ. Code § 1927

189.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

190.    All claims are based on the belief of Plaintiff.

191.    Defendants breached the Implied Covenant of Quiet Enjoyment against Plaintiff making the property untenable over a reasonable time for a long duration on multiple occasions.

192.    California Civil § 1927 states, "If within a reasonable time after written or oral notice to the landlord or his agent of dilapidations rendering the premises unteneable which the landlord ought to repair, the landlord neglects to do so, the tenant may repair the same himself where the cost of such repair does not require an additional expenditure more than one month's rent of the premises and deduct the expenses of such repairs from the rent when due."

193.    Plaintiff is guaranteed quiet enjoyment and has the right to undisturbed use and possession of the property without interference from the landlord or other parties, especially when the interference is significant enough to substantially affect the use and enjoyment of the property. This includes entering the property without notice, failing to address serious safety issues, or failing to prevent disruptive noise and smells from other tenants can be considered a breach.

194.    Plaintiff failed to have quiet enjoyment with the constant harassment from One Paseo employees, ranging from broker washer-dryer machine (2), nonstop smoking (cigarette, pot, vaping) from the tenant living below Plaintiff, the

second bathroom in disrepair for most of Plaintiff's residency, and constant rate increases with the last notice at $7700.00/month, not yet applied. The inability to locate property managers to remedy the issues was a constant concern for Plaintiff as she could not even get the names of those property managers from the GREYSTAR employees. Not one of them contacted Plaintiff or stopped by the address the issues and pleas from Plaintiff.

195.    The defendants' conduct, which includes lack of action, was a substantial factor in the breach of quiet enjoyment against the Plaintiff's and each conduct was in furtherance of the violation.

196.    Plaintiff seeks all available damages, including treble damages where applicable.

## TENTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY OF HABITABILITY

### Cal. Civ. Code § 1941.1

197.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

198.    All claims are based on the belief of Plaintiff.

199.    Defendants breached the Implied Warrenty of Habitability against Plaintiff making the property untenable over a reasonable time for a long duration on multiple occasions.

200.    The defendants created an untenable environment for Plaintiff to live in. Not only was there a broken washer-dryer out in the open, it also blocked a bedroom and prevented functional access for the intended use and purpose of the apartment. In addition, defendants broke Plaintiiff's personal replacement washer-dryer, in their attempt to flood the apartment. Finally, the second bathroom was inoperable except for the most recent two months or so and despite multiple requests, it was never fixed until recently.

201.    The Implied Warranty of Habitability implicitly warrants that the leased

premises is suitable for living and will be maintained in a habitable condition throughout the lease term. Plaintiff contracted for a two bedroom, two bath apartment and only has useable space of one bedroom and one bath for majority of the term, now in the sixth year.

202.    With GREYSTAR leaving a broken washer-dryer appliance for more than 30 days, they punished the tenant to pay for a new washer-dryer in its place. When the employees further punished Plaintiff for exercising her right under the guise of "permissions," they added intimidation and coercion to the list of violations. When they entered the property and refused to remove it, the violations continued. Leaving the washer-dryer created a substantial reduction in habitability as more than 50% of the apartment was not useable for its intended purpose.

203.    In addition, GREYSTAR employee David1 also broke the handle on the oven right in the front of Plaintiff. This caused difficulty in cooking with the oven and the Plaintiff uses the oven every day. Plaintiff believes David1 still works for GREYSTAR.

204.    In June 2025, Employee Julian attempted to pull the oven handle completely off. When it did not come off, he stated, "I thought that would come off." He then took a photo of the oven handle hanging, perhaps to prove that he did it. Plaintiff believes Julian still works for GREYSTAR.

205.    The Defendants' conduct were a substantial factor in the violation of the implied warranty of habitability against the Plaintiff's and each action was in furtherance of that violation.

206.    Plaintiff seeks all available damages. Replacement of costs for the personal washer-dryer. Treble damages where applicable. An injunction against further destructive behavior inside Plaintiff's apartment.

/ / /

/ / /

# ELEVENTH CAUSE OF ACTION

## ACTUAL FRAUD

### Cal. Civ. Code § 1572

207.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

208.    All claims are based on the belief of Plaintiff.

209.    Defendants committed actual fraud against Plaintiff on multiple occasions across a long period of time with participation from multiple employees.

210.    Actual Fraud occurs when any of the following acts, when committed by a party to a contract with intent to deceive another party to induce them to enter the contract: (1) suggesting something untrue that the actor doesn't believe to be true; (2) making a positive assertion that isn't true, even if believed true, without sufficient information; (3) suppressing a fact that is true; (4) making a promise without any intention to perform it; or (5) any other act fitted to deceive

211.    Actual fraud requires a false statement, knowledge of its falsity, intent to induce reliance, justifiable reliance, and damages. Requires intentional misrepresentation.

212.    In one instance, after a mid-month rent increase on a MTM rental term, TBARR and the front office would not provide me with the rental amount calculation. First, the rental period should be the term period in this case the month. However, GREYSTAR constantly goes off of the start date at the location regardless of the agreement. Despite multiple request, I never received an explanation as to the calculation. Here, they misrepresented the rental amount, TBARR was false and she knew it was false. The false calculation was made with the intention to deceive, Plaintiff relied on it because the end of the month appeared and needed to be paid or otherwise Plaintiff's rent would be late. Plaintiff suffered financial damages for the increased mid-month rent.

213.    Employee TBARR intentionally made false statements about Plaintiff's rent being late and sent Plaintiff a "Notice to pay rent or quit" on April 7, 2025. Plaintiff paid rent on April 2, 2025. After rent was paid, employee TBARR made changed to the system and added all new pricing with a significant increase in the monthly rental payment. Employee TBARR knew it was false because the electronic system indicates when payments are made. Plaintiff relies on that electronic system for payment purposes. Plaintiff has no choice but the pay the amount that GREYSTAR posts in its electronic payment system so Plaintiff's reliance was justifiable. As a result, employee TBARR also posted and increase in rent payment for two previous months in which Plaintiff already paid rent for $1,822.00 each month for two months, resulting in $3,644.00 additional dollars moved into May's posted rent. This is a violation of actual and financial fraud. Plaintiff sent a note to employee TBARR stating that the back-dated charges were illegal. There was no response at time of filing.

214.    Plaintiff seeks all available damages. Treble damages (3 times actual damages) are a legal remedy intended to punish egregious behavior and deter future misconduct, particularly against theft-related business torts such as this.

215.    Defendants' conduct, particularly TBARR, was a substantial factor in the Defendants' actual fraud against the Plaintiff.

216.    Plaintiff seeks all available damages. Damages should include treble damages where applicable.

## TWELFTH CAUSE OF ACTION

### CONSTRUCTIVE FRAUD

### Cal. Civ. Code,  § 1573

217.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

218.    All claims are based on the belief of Plaintiff.

219.    Defendants committed constructive fraud against Plaintiff on multiple occasions across a long period of time with participation from multiple employees.

220.    California Civil Code § 1573 stated that "in any breach of duty which, without an actual fraudulent intent, gains an advantage to the person in fault, or any one claiming under him, by misleading another to his prejudice, or to the prejudice"

221.    The code specifically includes "in any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud."

222.    Employee TBARR intentionally made false statements about Plaintiff's rent being late and sent Plaintiff a "Notice to pay rent or quit" on April 7, 2025. Plaintiff paid rent on April 2, 2025. After rent was paid, employee TBARR made changed to the system and added all new pricing with a significant increase in the monthly rental payment. Employee TBARR knew it was false because the electronic system indicates when payments are made. Plaintiff relies on that electronic system for payment purposes. Plaintiff has no choice but the pay the amount that GREYSTAR posts in its electronic payment system so Plaintiff's reliance was justifiable. As a result, employee TBARR also posted and increase in rent payment for two previous months in which Plaintiff already paid rent for $1,822.00 each month for two months, resulting in $3,644.00 additional dollars moved into May's posted rent. This is a violation of actual and financial fraud. Plaintiff sent a note to employee TBARR stating that the back-dated charges were illegal. There was no response at time of filing.

223.    Plaintiff seeks all available damages. Treble damages (3 times actual damages) are a legal remedy intended to punish egregious behavior and deter future misconduct, particularly against theft-related business torts such as this.

224.    Defendants' conduct, particularly TBARR, was a substantial factor in the

Defendants' actual fraud against the Plaintiff.

225.   Plaintiff seeks all available damages. Damages should include treble damages where applicable.

### THIRTEENTH CAUSE OF ACTION

### CONVERSION OF PERSONAL PROPERTY,

### Cal. Civ. Code § 3336 (EXCEEDS $950)

226.   Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

227.   All claims are based on the belief of Plaintiff.

228.   Defendants committed Conversion of Personal Property against Plaintiff in their damage to a new washer-dryer purchased by Plaintiff and rendering it inoperable, with continues to be inoperable.

229.   The conversion theft falls criminally under California Penal Code, § 496 (exceeds $950) arises when someone intentionally and substantially interferes with another person's personal property without permission.

230.   The civil claim of conversion civil code § 3336 is used in situations where someone has unlawfully taken or interfered with another's property, similar to criminal theft, to award monetary damages for the wrongful interference with their property.

231.   Employee Peter intentionally and substantially interfered with Plaintiff's personal property, the new washer-dryer, without permission. Peter violated Plaintiff's rights through conversion. Employee Peter was admitted into the apartment but he exceeded the scope of the consent when he tampered with the washer-dryer, and pulling the drain hose out of the waste pipe so it would flood next time Plaintiff used the new washer-dryer. This coincided with the addition of the "rent protection charge" that had recently been added to the bill. This was a premeditated, intentional, and unlawful act. The new washer-dryer remains unused today and continues to leave Plaintiff without a washer-dryer.

It has been several years now.

232.    Employee Peter's conduct, and those that solicited him or helped him any way were a substantial factor in the conversion of the Plaintiff's personal property.

233.    Plaintiff seeks all available damages, including fair market value of the property, special damages and compensation for the time and money spent pursuing the claim.

## FOURTEENTH CAUSE OF ACTION

### TRESPASS

### Cal. Civ. Code § 3346

234.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

235.    All claims are based on the belief of Plaintiff.

236.    Defendants trespassed in Plaintiff's apartment when they exceeded any consent authorized by Plaintiff for entry in an effort to destroy personal property and the property provided for use as part of the lease agreement.

237.    A tenant has the right to quiet enjoyment and exclusive possession of their rental unit. If the landlord's personnel entered the unit illegally or exceeded the consent to destroy the property, then they have committed trespass.

238.    While a person may initially have consent to enter property, they can exceed the scope of consent by specifically "exceeding the purpose of entry" and "engage in other activities without permission", that may exceed the scope of consent,

239.    The four instances where property maintenance damaged or destroyed an appliance in Plaintiff's apartment, it was done so when each employee entered for one purpose and then did something else while they were in the apartment.

240.    In employee Jeff's instance, he entered to replace a part on the washer-dryer. He ended up taking apart the entire machine and never reconnected the

covering on one of the machines. Jeff left the apartment leaving the washer-dryer unit in the main area instead of the washer-dryer closet.

241.    In David1's instance, he entered with Daria to replace a filter and inspect something in the apartment. On his way to the bathroom, he stopped and fiddled with the oven handle connection piece until it broke.

242.    In Peter's instance, he entered to look at the water meter, which is something now know the maintenance people are not supposed to touch. He ende dup breaking Plaintiff's personal washer-dryer and positioning the exit tube some it would allow water to flood the floor.

243.    In Julian's instance, he entered for an annual inspection and then tried to rip the handle off of the oven. When he entered, Plaintiff had him sign his name as all people who enter the apartment do. After he broke the oven handle, he left for four hours. He returned and asked if he could see the sign in document which I showed him. His response was "I shouldn't have used my real name."

244.    The conduct of these employees were a substantial factor in the trespass against the Plaintiff. None of these four are currently defendants.

245.    Plaintiff contends that the property manager and the superviro of maintenance take a solicitation role in recruiting these candidates, some believed to be from other GREYSTAR locations. After each instance or notification or each instance, neither the property manager nor the supervisor every responded to the Plaintiff or stopped by the apartment to review the damage. In Julian's instance, they probably just looked at the phot.

246.    Plaintiff seeks all available damages for the new washer-dryer with trable damages as applicable. Plaintiff also does not want to be charged for any appliance damage on move-out.

/ / /

/ / /

# FIFTEENTH CAUSE OF ACTION

## NUISANCE

### Cal. Civ. Code § 3479

247.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

248.    All claims are based on the belief of Plaintiff.

249.    Defendants failed to prevent ongoing nuisance issues against Plaintiff for a long period of time affecting Plaintiff's use of the property and causing an environment that was injurious to health and offensive to the senses.

250.    Nuisance includes anything that obstructs the free use of property, interferes with comfortable enjoyment of life or property, or is injurious to health, indecent or offensive to the senses.

251.    Nuisance includes Plaintiff's issues concerning offensive odors and other disturbances, especially smoke (cigarette, pot, vaping) in a supposedly non-smoking building or complex. This also covers conditions that pose a threat to public health which includes smoke and the exposed washer-dryer waste pipe.

252.    One Paseo is a smoke-free complex, inside and out, and the employees continued to place smokers (cigarette, pot, vaping) in the unit below Plaintiff for the entire time living in the complex. Plaintiff must wear a mask often while in the apartment due to the smells, but since violator is in the unit below, the smells seep through even with shut windows.

253.    TBARR was a substantial factor in the violation of nuisance against the Plaintiff as she really did little to stop the smoking, particularly in the apartment below. There has been little to no movement since July. Plaintiff believes that tenant has been relocated.

254.    Plaintiff suspects that tenant was renting out the apartment during the week between Sunday to Friday. Key access must have come from participation in the front office. Friday to Sunday was most likely that tenant himself. Plaintiff

believes the "renting" relationship maybe have been significant as to why the smoking (ie cigarette, vaping, pot) was allows to continue so long, and why there were different smoking smells each week.

255.    There were other instances of nuisance. For example, Plaintiff often has other people parking in her assigned parking spots, sometimes for weeks. Of all the open parking spots, there is no reason for them to park in Plaintiff's spot unless they were told to do so.

256.    Plaintiff seeks all available damages, including injunctive relief, lost use and enjoyment of property (inconvenience), and emotional distress. Punitive damages should apply since Defendants' actions were intentional, malicious or reckless and gross negligence should apply.

## SIXTEENTH CAUSE OF ACTION

### INVASION OF PRIVACY

### Cal. Civ. Code § 1708.8

257.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

258.    All claims are based on the belief of Plaintiff.

259.    Defendants created Invasion of Privacy issues against Plaintiff on multiple occasions across a long period of time.

260.    The invasion of privacy law protects individuals from having their private, personal or familial activities captures without their consent, especially when it involves entering their property or airspace to do so.

261.    The Defendants are libel if they knowingly enter Plaintiff's property or airspace without permission to capture visual images or sound recordings of someone engaging in private activities. This also includes situations where the capturing occurs in a way that is offensive to a reasonable person.

262.    This occurred when Peter entered to tamper with Plaintiff's washer-dryer appliance. As he approached the washer-dryer closet he said aloud, "This is the

old washer dryer and this is the new washer dryer." He had no permission to record inside the unit.

263.    The two employees, David-1 and Darian, that entered to damage the stove handle and to take notes into the ipad. They had no permission to record inside the unit.

264.    Finally, Employee Julian took pictures while he was in the unit. He asked if he could take one or two specific ones, but he kept looking at his phone, so Plaintiff suspects he was either on a phone call with someone on the other end. California is two party state.

265.    Plaintiffs also released private, personal information to third party providers by releasing address, email, or other information which should have been kept confidential. Plaintiff doesn't use the One Paseo Village address for any correspondence.

266.    The defendants' conduct were a substantial factor in the violation of privacy against the Plaintiff's and each action was in furtherance of that violation.

267.    Plaintiff seeks all available damages. Also, Damages economic and noneconomic including emotional distress, statutory damages (up to $30k) punitive, reasonable attorney fees, and costs. Violators may also face a civil fine of $5k to $50k.

## TWENTIETH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### CACI No. 1600

268.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

269.    All claims are based on the belief of Plaintiff.

270.    Defendants caused long term intentional infliction of emotional distress on Plaintiff through extreme and outrageous conduct of ongoing harassment,

destruction of property, and creating an untenable living condition.

271.    Intentional Infliction of Emotional Distress (IIED) is a legal claim for harm caused by another person's extreme and outrageous conduct, which was intended or recklessly done to cause severe emotional distress.

272.    Here, the defendants actions concerning the broken washer-dryer left in the apartment for years, the breaking of Plaintiff's personal washer-dryer, leaving Plaintiff without any washer-dryer to this day, the breaking of appliance by the maintenance staff right in front of Plaintiff is astonishing, the dramatic increases in rent is astounding, the lack of responses from employees and executives at companies is disrespectful, and not one property manager responding to this extreme and outrageous conduct of these GREYSTAR employees is unconscionable.

273.    This conduct has been intentional with reckless disregard for causing Plaintiff to suffer this distress. The conduct was a substantial factor in causing the distress.

274.    Defendants have discriminated against Plaintiff through chronic and systemic intentional, reckless, extreme, and outrageous conduct throughout the duration of Plaintiff's six (6) year tenancy at the One Paseo apartment complex substantially caused severe emotional distress.

275.    A reasonable person in a civilized society would not expect to have all of the unbearable actions and events highlighted in this Complaint to have happened for one (1) day, much less ongoing and incremental over Plaintiff's duration of tenancy at One Paseo.

276.    Some of the more egregious actions include the actions by employees actions when maintenance employees left a broken washer-dryer unit occupying more than 50% of Plaintiff's apartment from November 15, 2021 until May 2024. Maintenance had 30-days to repair and failed to do so. Also, employees broke/tampered with Plaintiff's replacement personal washer-dryer

rending it unusable beginning September 2022 to present as of filing. In addition, employees continually rented the apartment below to smokers (cigarette, pot, vaping) and failed to prevent smoking of those tenants over six (6) year period.

277. Finally, Property managers and CEO AMAN failed to respond to Plaintiff and issues continue through this day.

278. Plaintiff seeks all available damages. Damages include Compensatory damages, including mental anguish, pain and suffering, loss of enjoyment for diminished quality of life. Punitive damages for particularly egregious behavior and deter similar conduct in the future.  Attorney fees as necessary.

## TWENTY-FIRST CAUSE OF ACTION

### NEGLIGENCE

### Cal. Civ. Code § 1714

279. Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

280. All claims are based on the belief of Plaintiff.

281. Defendants routinely participated in multiple negligent actions across a long period of time against Plaintiff, directly breaching the duty of care and causing Plaintiff damage.

282. Negligence requires duty of care, breach, causation, and damages.

283. A landlord's duty of care in a landlord-tenant relationship is their legal obligation to maintain a safe and habitable environment for tenants by making necessary repairs, adhering to building and health codes,  and taking reasonable steps to prevent foreseeable harm. This includes  ensuring essential systems like plumbing, electrical, and heating are functional, keeping common areas safe,a nd protecting  residents from foreseeable dangers.

284. As landlord, KILROY is responsible for ensuring this duty of care is being followed by their outsourced property management company GREYSTAR.

285.    Plaintiff's apartment was not safe and habitable as there was a broken washer-dryer sitting in the main area and blocking a bedroom for years, until May 2024. The second bathroom toilet did not work since the move-in date, and a part was only recently replaced on it.

286.    There is also a duty of care in ensuring the contract is followed. Violations in rent hikes, self-help eviction efforts, and failure to respond to Plaintiff's pleas to fix situations. These are just a few examples.

287.    A breach of that duty occurs when 30 days pass by on maintenance requests without resolution, when there are four instances of maintenance personnel breaking appliances, when broken washer-dryer units are left out blocking access to rooms, when property managers and executives don't respond to Plaintiff's requests for issue resolution, and when rent hikes become so outrageous wrongful eviction efforts are in plain sight. These are just a few examples.

288.    In addition, Negligence Per Se applies which means that the defendant is automatically presumed to be negligent if the violate a statute or regulation, and that violations caused harm to Plaintiff who was within the class of people the law was designed to protect. Defendants violated multiple statutes including the Implied Covenant of Quiet Enjoyment and the Implied Warranty of Habitability.

289.    Defendants' actions or inactions were the actual and proximate cause and a substantial factor in causing Plaintiff's harm financially, emotionally, and legally.

290.    Finally, Plaintiff suffered actual damages, including pain and suffering, property damages, and financial damage with all of the rate hikes and other expenses.

291.    Gross negligence occurs with a higher stand of negligence which is achieve by Plaintiff due the long duration, the unconscionability of the event, the

amount of cause of actions during this period, and incremental nature of the violations. This makes the violation relevant for punitive damages.

292.    Plaintiff seeks all available damages. Given gross negligence is applicable, this is eligible for punitive damages.

## TWENTY-SECOND CAUSE OF ACTION

## NEGLIGENT HIRING, SUPERVISION, OR RETENTION OF EMPLOYEE

## CACI No. 426

293.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

294.    All claims are based on the belief of Plaintiff.

295.    Defendants allow for negligently hired, supervised, or retained employees that routinely interacted with Plaintiff that were unfit for their role and that unfitness caused harm against Plaintiff.

296.    Negligent hiring, supervision or retention of employee occurs when an employer fails to take reasonable steps to ensure an employee is fit for their role and does not cause harm to others.

297.    With respect to the Greystar employees, there appears to be a lack of basic Landlord-Tenant law which should have been a requirement for employee, and something that should have been monitored with proper supervision.

298.    In addition, even when these employees violate the lease agreement, or fail to respond, or break something inside the apartment, they remain employees. Plaintiff believes that even when these employees leave One Paseo Village, they still have access to the property and the apartments on their phone. The maintenance people who Plaintiff believes should be bonded still enter tenant apartments and the bonding company is likely never notified of infractions like breaking appliances.

299.    Defendants' conduct shows repeated lack of knowledge necessary as

employment in the where the owner/landlord is in Real Estate, and employees manage an apartment complex. This unconscionable actions occurred through the Plaintiff's six (6) year tenancy in an ongoing and incremental manner.

300.    With respect to the KILROY employees, the KILROY CEO, as landlord, did not respond in a reasonable thirty (30) day period to an escalation of the conduct occurring at One Paseo by the outsourced GREYSTAR employees, despite an email with ten (10) attached documents detailing specifics and a photo.

301.    These require only a basic understand even the most basic Landlord-Tenant law which should have been a requirement for employment as a CEO of a real estate company, and it is something that should have been monitored with proper supervision.

302.    KILROY, as a real estate company, should have known to hire a property management company that appropriately enforces Landlord-Tenant law and the property management company should have been properly evaluated for compliance. KIROY hired GREYSTAR as a property management company, and failed to manage them properly, permitting GREYSTAR to break federal and state laws from November 2021 to present date as of time of filing.

303.    Plaintiff has had to endure most of these issues for multiple years. Plaintiff has had no functioning washer-dryer unit, sans the limited seven (7) months post purchase of her personal washer-dryer. The apartment was supposed to be furnished with a functioning washer-dryer as part of rent.  One Paseo is supposed to be a smoke-fee complex, inside and out, and the employees continued to place smokers (cigarette, pot, vaping) in the unit below Plaintiff for the entire time living in the complex. Despite continuous breach of contract issues, Plaintiff's rent continues to sky-rocket and illegal charges continue to be applied to the monthly rental charge with no ability to pay only for valid charges.

304.    The negligence in hiring, supervising, or retaining, from KILROY and its employees, and GREYSTAR and its employees, was a substantial factor in causing Plaintiff's harm as highlighted in this Complaint. These employees were retained, moved to another location or promoted, even when Plaintiff identified them by name.

305.    Plaintiff seeks all available damages.

## TWENTY-THIRD CAUSE OF ACTION

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### CACI No. 1620

306.    Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

307.    All claims are based on the belief of Plaintiff.

308.    Defendants caused serious and severe long term negligent infliction of emotional distress on Plaintiff through ongoing negligence and their breach of duty was a direct cause of the Plaintiff's emotional distress.

309.    Negligence was already addressed above. With Negligent Emotional Distress, the defendants breach of duty was a direct cause of the Plaintiff's emotional distress. The Plaintiff suffered  serious, severe emotional distress as a result.

310.    Plaintiff had a broken unit in her main living area and blocking all access to the second bedroom for years. Plaintiff has not had a functioning washer-dryer for years. The second bathroom has not had a functioning toleit for years. Rent has been higher than other comparable units for years.There was no reason for these GREYSTAR employees to come after Plaintiff, harass Plaintiff, overcharge Plaintiff, break appliance in front of her, and prevent her from washing clothes in a penthouse apartment. This is her sixth year as a tenant in that penthouse apartment. There are not many people that could endure what endured. There are not many people that would not have been inflicted with

negligent emotional distress.

311. The breach of reasonable duties would have cause anyone negligent emotional distress. Had the defendants not been negligent. Had KILROY and AMAN not been negligent in responding eith (8) months ago, the litigation probably would be in play right now, and Plaintiff would probably have a functioning washer-dryer.

312. Defendants conduct was a substantial factor in the negligent infliction of emotional distress against the Plaintiff's and each action was in furtherance of that conspiracy.

313. A reasonable person would expect not to have all of the actions and events highlighted in this Complaint to have happened for one (1) day, much less ongoing and incremental over Plaintiff's duration at One Paseo Village.

314. Plaintiff seeks all available damages.

## TWENTY-FOURTH CAUSE OF ACTION

### BURGLARY

### Pen. Code  § 459

315. Plaintiff incorporates by reference each and every allegation in the foregoing paragraphs of this Complaint.

316. All claims are based on the belief of Plaintiff.

317. Defendants are responsible for the burglary associated with the new washer-dryer in Plaintiff's apartment through actions leading up to the burglary and the burglary itself.

318. Burglary under section 459 of California's Penal Code defines burglary as entering a structure (including an apartment) with the intent to commit a felony or theft (grand of petit larceny). It is important to note that entry doesn't always require a break-in, even entering through an open door with the intent to steal qualifies as burglary. First degree residential burglary involves entering an inhabited dwelling with the intent to commit theft or any felony. It is always a

felony.

319.    Employee Peter entered Plaintiff's apartment under false pretenses to check the water meter and with the intent to commit burglary to deprive Plaintiff of her personal property, a new washer-dryer appliance. Given the washer-dryer appliance cost over $950, which constitutes a felony.

320.    In addition, Employee Peter, Supervisor Jorge, and others from the maintenance team, the front office, and the property manager worked together in the rendering Plaintiff's personal washer-dryer unoperatable.

321.    In September 2022, the GREYSTAR maintenance employees sent Employee Peter to Plaintiff's apartment to break her personal replacement washer-dryer rendering it unusable and continues to be unusable as of this second amended complaint. Plaintiff has been without a functioning washer-dryer unit in her penthouse apartment since November 14, 2021, except for a short period when her personal washer-dryer machine was functioning.

322.    On September 13, 2022, a charge was added to the monthly billing statement called "Building Loss Protection Fee." This charge occurred monthly until December on different dates of the month despite multiple requests from Plaintiff to identify the purpose of that fee. It was identified as insurance offered by One Paseo Village, but Plaintiff already had apartment coverage on her own.

323.    On or about September 19, 2022 Peter left a notice to enter on Plaintiff's door and an appt was set up for him to return the next day to check the water meter. The next day, Plaintiff let Peter in and as they walked to the washer-dryer closet Peter said aloud to someone other than Plaintiff, "This is the old washer-dryer and this is the new washer-dryer." He unscrewed a small cover in the washer-dryer closet ceiling. Plaintiff returned to the couch to work. Shortly after, employee Peter left the unit and returned. Shortly after, a strange noise occurred and Plaintiff went over to the washer-dryer area. Employee Peter had

opened the spare bathroom door and began to fill an orange Home Depot bucket with water from the bath. Plaintiff explained that he cannot just open any door in the unit, and then walked to the water meter. He pointed to a piece of paper and said, "No. no.no." Plaintiff asked, "What's that smell? It smells like stale water." Employee Peter shrugged his shoulders and left. Plaintiff woke up about 4:00am that night with a headache and there was smell from the washer-dryer closet. The washer-dryer had been moved inside the closet and it looked like the waste exit pipe was now exposed from the drainage hole. Plaintiff had no access to the maintenance reporting system as it would not allow her to log into the system. Plaintiff sent an email instead. The next day Plaintiff saw employee Peter in the hallway and asked what he did. Peter looked at the floor and would not respond. The waste exit pipe remains exposed as of this filing. Plaintiff covered the washer-dryer closet door with plastic garbage bags and tape in an attempt to keep the smells out of the apartment. Again, no response from the front office or maintenance. Plaintiff remembers employee Jeff told her that "they do everything, but the water meter" as "we can't touch that." Jeff was re-located, presumably to another GREYSTAR managed complex. Employees re-locate all the time seemingly to other GREYSTAR locations. If something goes wrong, the person gets transferred to another location. After mentioning to an employee that enters the apartment someone's name that was part ongoing issues,  they typically say, "they're not here anymore." Plaintiff could not even get an employee to give her the property manager's name for escalation.

324.    Employee Peter's burglary actions and the actions of other employees that helped him caused Plaintiff harm as it left Plaintiff with no washer-dryer, much less a brand new washer-dryer, for years.

325.    Defendants actions and the actions of their employees leading up to the burglary and the burglary itself was a substantial factor in the burglary against

the Plaintiff's and each employee participation was in furtherance of that violation.

326.    Plaintiff seeks all available damages. The Court should find Defendants involved guilty of first degree residential burglary. Civil Damages could include value/cost of stolen property, and repair costs for any damage to the residence. Penalties can result to up to six years in state prison.

## **PRAYER**

**WHEREFORE,** Plaintiff prays for judgment as follows:

1. Enter a judgement against Defendants for all claims;

2. Award Civil penalties as appropriate of at least $25,000 paid to the government for specific claims as appropriate.

3. Awarding compensatory, incidental, and consequential damages, in an amount that the Court or jury determines, in accordance with applicable law;

4. The Court should find Defendants involved guilty of first degree residential burglary.

5. Providing for any and all declaratory and injunctive relief deemed by the court;

6. Award declaratory and injunctive relief establish legal anti-discrimination rights under discrimination laws.

7. For punitive damages, including treble damages, to punish the egregious and outrageous conduct of Defendants according to proof, but not less than One (1) Billion Dollars;

8. For judgment in favor of Plaintiff and against each Defendant on all causes of action;

9. Awarding Plaintiff reasonable costs and expenses of suit, including attorney fees;

10. Awarding statutory damages in the maximum amount the law provides;

11. Awarding for pre-judgement and post-judgement interest to extent the law allows;

12. For such other and further relief as this Court may deem fair, just, equitable and proper.

Respectfully submitted,

Dated: August 29,2025            **LAURA SAITTA**

/Signed per Cal. Rules Court rule 2.257/

By:    __/s/ Laura Saitta_____
Plaintiff in Pro Per Laura Saitta

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBIT 1

Saitta v Greystar COMPLAINT - EXHIBIT 1 - Plaintiff photo 042424 of broken washer-dryer

